# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MISSOURI ST. JOSEPH DIVISION

| | | |
|---|---|---|
| ANN FORD-VARNES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 04-6099-CV-SJ-DW |
| | ) | |
| | ) | |
| JOHNSON CONTROLS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

Pending before the Court is Defendant Johnson Controls, Inc.'s motion for summary judgment (Doc. 37). Defendant seeks judgment in its favor on Plaintiff's three count Complaint alleging sex, wage, and disability discrimination during her employment with the defendant. Plaintiff filed suggestions in opposition (Doc. 52) and Defendant filed reply suggestions (Doc. 54). After reviewing the record and the applicable law, the Court finds no genuine issue of material fact suggesting Plaintiff is entitled to relief. Accordingly, for the reasons stated below, Defendant's motion for summary judgment is granted.

### I.    FACTUAL BACKGROUND

Plaintiff Ann Ford-Varnes ("Ford-Varnes") contends that during her employment she was exposed to various forms of discrimination including a hostile work environment based on harassment because of her sex, receiving less compensation than her male counterparts, and discrimination due to her clinical depression.

Ford-Varnes was hired by Defendant Johnson Controls, Inc. ("JCI") on January 2, 1990 as

a technical writer based in Milwaukee, Wisconsin. In 1994, Ford-Varnes was transferred to an engineering position in the battery casting department, also based in Milwaukee. In this position, Ford-Varnes traveled to various JCI battery plants throughout Mexico and the United States implementing and troubleshooting new production equipment. In September 1999, Ford-Varnes moved to Plattsburg, Missouri and continued in the same capacity, still assigned to the corporate office in Milwaukee but reporting to the St. Joseph plant once or twice per week. In mid-2001, Ford-Varnes took a three month medical leave of absence because of her depression. In March 2004, Ford-Varnes took a medical leave of absence until she resigned her employment on June 28, 2004.

    A.    <u>Facts Related to Sexual Harassment Claim</u>

Ford-Varnes alleges that during the time that she reported to the Milwaukee corporate office, she was treated differently because of her sex in that she was not included in post-work activities by her supervisor Rick Bender; was communicated to differently than other male employees; did not receive a pay increase when reclassified as an engineer; and was not offered a severance package in 2001 like other male engineers when the company decentralized engineering positions from the corporate office to the individual plants. In April of 2000, Ford-Varnes made a formal complaint to Herm Bauer, the Human Resources Manager at the St. Joseph plant, regarding inappropriate sex-related comments made in her presence by employee Bob Anderson regarding another female employee. The company investigated the incident and determined that this did not violate JCI's anti-harassment policy and no formal action was taken against Mr. Anderson.

Beginning in mid-August 2001, Ford-Varnes was transferred permanently to the St. Joseph

Case 5:04-cv-06099-DW   Document 58   Filed 02/06/06   Page 2 of 22

plant and was required to work at the St. Joseph plant.[1]  During the relevant time period of her employment at the St. Joseph plant, Ford-Varnes reported to the following supervisors: Gary Chamness - October 2001 to February 2003; Dave Glidewell - February 2003 to August 2003; Chris Britt - August 2003 to November 2003; and Jim Schleusner - November 2003 to June 28, 2004.

While reporting to Mr. Chamness, Ford-Varnes complains that she was subjected to a hostile work environment rife with various harassing conduct, including : (1) daily harassment and ridicule by Mr. Chamness; (2) unreasonable production demands by Mr. Chamness; (3) she was required to make her weekly reports to Mr. Chamness in writing while other engineers gave their reports orally; (4) she was required to shower daily but the women's shower/locker room was not maintained or cleaned; (5) co-employee Cheryl Riggs filed a harassment complaint against Mr. Chamness; (6) the company did not respond to her own complaints about Mr. Chamness until Ms. Riggs filed her complaint; (7) Ford-Varnes' rate of pay was different than other male engineers and she did not receive overtime pay; and (8) the severe harassment triggered her depression.  (Pl. Suggestions in Opp'n at 15-16.)  Ford-Varnes also states that Mr. Chamness assigned her to perform an inventory with Bob Anderson in February 2002 with full knowledge that she had previously reported him for harassment.  Although Ford-Varnes states that this disturbed and frightened her, she claims no additional harassing behavior and no formal or informal complaints arose from this incident.

Ford-Varnes alleges that her performance evaluations also support her claims of a hostile work environment.  In her November 2001 performance review by Mr. Chamness, Plaintiff received a "3-Consistently Meets Expectations."  Mr. Chamness states in his deposition that because he had only been supervising Plaintiff for one month, this review was based upon her previous supervisor's

---

[1] Starting at this time Ford-Varnes was no longer permitted to work from home and apparently no longer traveled to other plants.

evaluation. However, in Ford-Varnes' November 2002 review, Mr. Chamness gave Plaintiff "2-Usually Meets Expectations" rating and identified areas for improvement. Ford-Varnes claims that this is inconsistent with her actual performance as supported by her prior receipt of a President's Award during her time in Milwaukee. She also states that because she is a woman Mr. Chamness failed to give her adequate recognition for this award in front of her co-engineers. In November 2003, Mr. Schleusner began supervising Ford-Varnes and postponed her performance review for six months. Although Mr. Schleusner had performance ratings provided by Ford-Varnes' peers, he opted to wait six months to observe her performance himself. Mr. Schleusner never completed this review because Plaintiff went on medical leave in March 2004 and then resigned her employment with JCI in June 2004 without returning from medical leave. Thus, although Ford-Varnes routinely received raises between 1999 and 2003, she received no raise in 2004.[2]

The record indicates that both management and employees had concerns or problems with Mr. Chamness' managerial style. Robert Murawaski, an hourly employee supervised by Mr. Chamness, complained that their personalities did not "coincide" and that the first thing Mr. Chamness ever said to him was that he, Mr. Chamness, would personally see to it that Murawaski's job would be eliminated. James Wachtel, a supervisor in the Pasting Department, stated that Mr. Chamness was not liked by the engineers in the plant. Warren McDonald, an engineer reporting to Mr. Chamness, stated that he did not get along with Mr. Chamness and found his management style "confrontational." Ms. Ford-Varnes confirmed in her deposition that other engineers supervised by Mr. Chamness, including Warren McDonald, Dan Wiltshire and Rick Gove, complained about his

---

[2] There appears to be some dispute in the record as to whether the raise would have been retroactive. However, because Plaintiff admits that she did not believe her review was postponed because of her sex, this fact is not material and has no impact on the Court's decision.

4

management style and unreasonable production demands. Herm Bauer also stated that Mr. Chamness was not well liked by the engineers he supervised. These concerns, combined with the Cheryl Riggs incident[3], precipitated the request for his resignation.

As noted above, Plaintiff availed herself of JCI's no-harassment policy by making a complaint against Bob Anderson in April 2000 for comments made in her presence related to another female employee. Another female employee, Cheryl Riggs, also utilized these procedures to make a complaint against Mr. Chamness in an incident unrelated to Plaintiff's claims. Mr. Bauer states that Ford-Varnes approached him on two other occasions with complaints regarding Mr. Chamness and that these complaints were related to her November 2002 performance review and a seventy-hour work week resulting from a shift change in January 2003. Mr. Bauer states that Ford-Varnes made no complaints to him that Mr. Chamness was harassing her because of sex or her clinical depression.

B.     Facts Related to Wage Discrimination Claim

Plaintiff identifies four male engineers who were paid more than her during her employment at JCI's St. Joseph plant. These individuals and their salaries are: Dan Wiltshire - $73,805.00, McDonald - $63,515.00, Steve Edington - $67,932.00, and Steve Turner - $67,211.00. JCI employs other engineers or employees to perform engineering tasks who do not possess engineering backgrounds, including Rick Gove (Senior Quality Engineer) and Kirk Porter (Health & Safety Representative). During 2002 and 2003, Ford-Varnes earned less than Rick Gove, but more than Kirk Porter. Ford-Varnes also earned greater bonuses in 2002 and 2003 than Kirk Porter.

The engineers employed by at the JCI St. Joseph plant have varied education, experience and

_____

[3] Chamness confronted another employee, Cheryl Riggs, after she had stated in a peer review form that Mr. Chamness did not like women.

duties. Ford-Varnes has a natural sciences degree and was initially hired by JCI's corporate office as a technical writer. Ford-Varnes has held no engineering positions in her prior work experience.

In contrast to Ford-Varnes, the engineers she has identified have significant engineering-related education and experience. Mr. Wiltshire has a engineering degree and prior engineering work experience. Ford-Varnes concedes that Mr. Wiltshire's responsibilities at the plant included working with robots on the production line in the pasting department, a responsibility that she did not have at the St. Joseph plant. Generally, Mr. Wiltshire was assigned various complex engineering projects at the plant that required extensive electrical engineering experience. Mr. McDonald has an engineering degree and has held engineering positions at multiple companies prior to his employment at JCI. Mr. McDonald had different duties and responsibilities than Plaintiff. Mr. Edington also has an engineering degree and prior engineering and supervisory work experience. Mr. Turner had no engineering degree when he was hired but completed his degree while employed at JCI. Mr. Turner also had prior engineering work experience. Mr. Turner was responsible for machine electrical systems in the St. Joseph plant. Mr. Turner worked in both the COS and plate-making areas of the plant and was assigned to more complex projects than was Ford-Varnes. Ford-Varnes does not dispute the descriptions of these engineer's background or work duties provided by JCI.[4]

In 2000, the St. Joseph facility adopted a policy that prohibited overtime for engineers. Only engineers hired before the policy went into effect were allowed to earn overtime. Only three engineers qualified to continue earning overtime: Steve Edington (start date in 1997), Warren McDonald (start date in 1999), and Steve Turner (start date in 1997). Other engineers at the plant,

---

[4] As stated by Herm Bauer in his Affidavit and supporting attachments (Doc. 40).

6

including Dan Wiltshire, Randy Reece, Kirk Porter, John Long, Rick Gove and Ford-Varnes, were ineligible for and did not receive overtime compensation.

C.      Facts Related to Disability Discrimination Claim

Ford-Varnes states that workplace stress at JCI severely affected her clinical depression and affected her ability to concentrate.  Ford-Varnes states that she took a three month medical leave of absence in 2001 due to her depression.  Ford-Varnes states that she also took a medical leave of absence in March 2004 because of her clinical depression.  Ford-Varnes admits that her clinical depression did not affect her ability to perform basic life functions—brushing her teeth, combing her hair, driving, speaking to other people, etc.

On June 28, 2004, Ford-Varnes sent JCI an email stating she was resigning because her "diabetes and depression are both severely affected by stress."  Attached to Ford-Varnes' resignation email was a letter from her physician, Dr. Murphy, stating that Ford-Varnes "could probably go back to work part-time to start with" but that Ford-Varnes felt it was in her best interest to resign.  In February 2005, Ford-Varnes started her own business selling beads and jewelry in Plattsburg, Missouri.

Ford-Varnes alleges that JCI imposed work shift changes that aggravated her medical condition.  Although she characterizes these shift changes as frequent, the record indicates that only two such shift changes occurred between January 2001 and March 2004.  From August 2001 to November 2002, Ford-Varnes worked 8 a.m. to 4:30 p.m., five days per week.  From November 2002 to January 2003, Ford-Varnes worked from 4:30 a.m. to 5 p.m., three days per week.  From January 2003 to March 2004, Ford-Varnes worked from 7 a.m. to 5 p.m., five days per week.

In January 2003, Ford-Varnes complained about having to work seventy hours in one week

7

because of the shift change and Herm Bauer gave her two days off to adjust to the change. Ford-Varnes admits that she made no request to management citing a medical necessity to either reduce or alter her shift at any time between January 2003 and March 2004. Ford-Varnes resigned her employment with JCI on June 28, 2004 without returning from medical leave.

II.     DISCUSSION

A.      Violation of Court's Order

Defendant first argues that the Court should dismiss Ford-Varnes' claims for failure to comply with the Court's June 28, 2005 Order (Doc. 32). On June 28, 2005, the Court ordered Ford-Varnes to pay $1,272.72 to cover reasonable fees and expenses incurred by Defendant when she failed to attend a properly noticed deposition. According to the Defendant, as of August 29, 2005, the filing date of the pending motion, Ford-Varnes had not complied with the Order. Defendant states that two requests for the funds were made and that they received no response at all from Ford-Varnes. Ford-Varnes does not contest these facts and simply states that as of the date of her response to the pending motion, "a check made payable to the firm has been sent in the amount of $1,272.72." (Pl. Suggestions in Opp'n at ¶ 8.)

Although the Court has the power to dismiss a litigant's cause of action for failure to comply with its orders, see Fed R. Civ. P. 41(b), the Court does not believe that Plaintiff's conduct warrants the imposition of such an extreme sanction in this case. Accordingly, the Court denies Defendant's motion to dismiss pursuant to Rule 41(b). The Court's refusal to dismiss this cause of action on this ground does not alter Plaintiff's obligation to comply with the Court's Order imposing the $1,272.72 sanction. The Court now orders Plaintiff to make this payment upon receipt of this Order, if payment has not yet been made.

8

B.    Standard of Decision

Summary judgment is appropriate if there is "no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law."  Rodgers v. U.S. Bank, N.A., 417 F.3d 845, 850 (8th Cir. 2005); Fed R. Civ. P. 56(c).  "The burden of demonstrating that there are no genuine issues of material fact rests on the moving party."  Winthrop Resources Corp. v. Eaton Hydraulics, Inc., 361 F.3d 465, 468 (8th Cir. 2004).  The Court reviews the evidence and draws reasonable inferences in the light most favorable to the non-moving party.  See Horn v. Univ. of Minn., 362 F.3d 1042, 1045 (8th Cir. 2004).  However, the non-moving party must present evidence sufficiently supporting the disputed material facts that a reasonable jury could return a verdict in her favor.  Rodgers, 417 F.3d at 850.  "While summary judgment should seldom be utilized in employment discrimination cases, there is no 'discrimination case exception' to the application of Fed. Civ. P. 56, and it remains a useful pretrial tool to determine whether or not any case, including one alleging discrimination, merits a trial."  Rodgers, 417 F.3d at 850 (citations and internal quotations omitted).

Local Rule 56.1 requires that the party opposing a motion for summary judgment shall specifically identify facts in dispute "refer[ring] to those portions of the record upon which the opposing party relies."  In her response, Ford-Varnes frequently states she "is unable to admit or deny the allegations" made by the movant in a particular paragraph and "therefore must deny the same."  While this is a satisfactory response in the Answer to a Complaint, it does not comply with Local Rule 56.1 and is insufficient to create a genuine issue at the summary judgment stage.  Accordingly, all facts not controverted with reference to the record are deemed admitted for the purposes of the pending summary judgment motion.

9

C.      Plaintiff's Claims

The Court has already dismissed Plaintiff's discrimination claims based upon alleged violations of Title VII, ADEA and ADA (October 27, 2004 Order, Doc. 3). The Court also ordered that Plaintiff could rely on events occurring on or before July 23, 2003 to support her claim of sex discrimination under a theory of hostile work environment only, and not in support of any claims of discrimination based on disparate treatment. On her response to the pending motion, Ford-Varnes has further narrowed her remaining claims in her response to the pending motion. Specifically, she has expressly abandoned her sex discrimination claim under a disparate treatment theory. (Pl. Suggestions in Opp'n at ¶ 14.) She also has expressly abandoned any claims of age discrimination under the Missouri Human Rights Act (MHRA). (Pl. Suggestions in Opp'n at ¶ 39.) Accordingly, these abandoned claims are dismissed with prejudice.

Thus, Plaintiff's claims are: (1) sex discrimination by creation of a hostile work environment in violation of the MHRA; (2) wage discrimination in violation of the MHRA and Equal Pay Act; and (3) disability discrimination in violation of the MHRA. Each are addressed in turn.

1.      Count I - Hostile Work Environment Sexual Harassment

To establish a prima facie case for sexual harassment, Ford-Varnes must show that: (1) she is a member of a protected group; (2) she was subject to unwelcome sexual harassment; (3) the harassment was based on sex; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take appropriate remedial action. Duncan v. Gen. Motors. Corp., 300 F.3d 928, 933 (8th Cir. 2002); Alagna v. Smithville R-II, 324 F.3d 975, 979 (8th Cir. 2003). Here, the question on summary judgment is whether a reasonable jury could find that the alleged sexual harassment affected a term,

Case 5:04-cv-06099-DW   Document 58   Filed 02/06/06   Page 10 of 22

condition, or privilege of Ford-Varnes' employment.[5]

To be actionable, sexual harassment must be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Woodland v. Joseph T. Ryerson & Son, Inc., 302 F.3d 839, 843 (8th Cir. 2002). A victim of harassment must have a "subjective belief" that she is working in a hostile environment in order that the harassment actually alter the conditions of the victim's employment. Kimzey v. Wal-Mart, 107 F.3d 568, 573 (8th Cir. 1997). "Conduct that is not severe and pervasive enough to create an objectively hostile or abusive work environment is not actionable discrimination. See Oncale v. Sundowner Offshore Servs, Inc., 523 U.S. 75, 81 (1998). Thus, the fourth element of a hostile work environment claim includes both objective and subjective components: an environment that a reasonable person would find objectionable and one that the victim actually perceived as abusive. Duncan, 300 F.3d at 934.

Whether a work environment is sufficiently hostile or abusive is judged by looking at all the circumstances. Clark County Sch. Dist. v. Breedon, 532 U.S. 268, 270 (2001) (quotations omitted). A court looks at a number of factors: the frequency and severity of the discriminatory conduct; whether the conduct was physically threatening or humiliating, as opposed to a mere offensive utterance; and whether the offensive conduct unreasonably interfered with the employee's work performance. See Harris, 510 U.S. at 23. Further, while federal law does not create a cause of

---

[5] The record further indicates that Plaintiff may be unable to satisfy the third element of the prima facie case. The evidence in the record provides scant support for Plaintiff's contention that the alleged abuse is motivated by sex. The bulk of Plaintiff's discriminatory incidents involve conduct by Mr. Chamness. It is clear from the record that Mr. Chamness had "negative" relations with many employees at the plant. The treatment cited by Plaintiff—unreasonable output demands and non-supportive professional interactions—has apparently been suffered by nearly all employees working under Mr. Chamness. This is not a burden endured exclusively by Plaintiff, or even just by female employees. It is also clear that Mr. Schluesner's decision to postpone Plaintiff's November 2003 review was not based on sex. Having just been assigned as Plaintiff's supervisor, Mr. Schluesner postponed Ford-Varnes review until he had time to observe her for himself. Indeed, in her deposition, Ford-Varnes concedes that she didn't believe that the postponement was due to her sex, but believed someone else should have performed the review so she could receive a raise. (Ford-Varnes Dep. at 275:6 - 280:12.)

action for all unpleasant or abusive behavior in the workplace, a workplace permeated with "discriminatory intimidation, ridicule, and insult" is sufficient to establish a hostile environment claim under federal law. Harris, 510 U.S. at 21-22. "The plaintiff must show a practice or pattern of harassment against her or him; a single incident or isolated incidents generally will not be sufficient. The plaintiff must generally show that the harassment is sustained and nontrivial." Moylan v. Maries County, 792 F.2d 746, 749-50 (8th Cir. 1986).

When viewed in the light most favorable to Ford-Varnes, the evidence in the record, together with all reasonable inferences from it, is insufficient to satisfy the fourth element of the prima facie case for sexual harassment. Plaintiff claims that she was treated differently at the St. Joseph plant because of her sex. In support of this claim, Plaintiff states that: her rate of pay was different from other engineers, she was required to perform inventory with a male employee against whom she had previously made a sex harassment complaint; her supervisor referred to her by use of pronouns ("her" and "she") rather than by her first name; she was not included in lunchtime activities with other engineers; she was subjected to ridicule on a daily basis; the women's dressing room/locker room facilities were not maintained; she was required to make written reports while other engineers were permitted to make oral reports; and she was forced to endure unreasonable job output demands. Plaintiff makes both generalized and specific allegations of discrimination; each will be addressed in turn.

Plaintiff claims that she was subjected to ridicule on a daily basis and "[she] believes the hostility in her case occurred not only through the daily harassment she outlined from [Mr. Chamness] but also through other actions." (Pl. Suggestions in Opp'n at p. 15.) Plaintiff also states that she "suffered a change in her work hours, *together with a reduction in her pay because of her*

12

*sex.* (Pl. Suggestions in Opp'n at p. 17.) However, Plaintiff has offered no explanation or detail regarding these incidents either in her Suggestions in Opposition or the attached affidavit. Furthermore, even though the specifically described incidents of harassment focus primarily on the conduct of Mr. Chamness, Ford-Varnes claims that the stress continued even after Mr. Chamness' resignation. She describes no incidents of alleged harassment by her subsequent supervisors or fellow employees to explain this. Notably, no shift changes or supervisor "harassment" occurred during the thirteen months from February 2003 to March 2004. These unsupported general assertions of harassment without specific facts do not create fact issues for trial.

Plaintiff also refers to a complaint lodged against Mr. Chamness by Cheryl Riggs, another female employee, as evidence that the St. Joseph plant was a workplace that was hostile to women. This complaint is at most, evidence of discrimination against Ms. Riggs and, at least, merely Ms. Riggs' unsubstantiated opinion regarding Mr. Chamness' views toward women. In either case, there is no evidence that Ford-Varnes' work environment was directly affected by any conduct directed toward Ms. Riggs. See Leibovitz v. New York Transit Authority, 253 F.3d 179 (2d Cir. 2001) (finding the conduct directed at another employee was not so pervasive as to affect plaintiff's own work environment or employment).

Ford-Varnes filed a complaint against co-worker Bob Anderson in April 2000 for inappropriate comments made in her presence concerning another female employee. Plaintiff then argues that the sexual harassment by Bob Anderson continued because Mr. Chamness assigned her to perform inventory with Bob Anderson in February 2002. She claims that Mr. Chamness knew of her prior complaint against Mr. Anderson. However, as noted above, there is no evidence in the record of any additional conduct by Mr. Anderson during the inventory that Plaintiff considered

13

harassment. This coupled with the nature of her original complaint against Mr. Anderson and its resolution by the company, does not rise to the level of an objectively hostile work environment. The timely actions of management in response to the identified harassment complaints against Mr. Chamness and Mr. Anderson further undermines any argument that JCI acquiesced in discriminatory conduct in the workplace.

Plaintiff also states that she was not included in lunchtime activities with the other engineers. Assuming that this could be a legitimate incident of sexual harassment, here it is not. Ford-Varnes has not described any incidents where she was specifically prohibited from these activities by Mr. Chamness or any other employees. She describes no incidents where any of her co-engineers made comments to or about her, related to her sex, which support her allegations. Further, Mr. McDonald states that it had nothing to do with Ford-Varnes' sex, but rather that she was not interested in doing things with the other engineers. (McDonald Dep. at 38:17 - 39:1.)

Ford-Varnes also complains that the women's locker room conditions were intolerable and not maintained in parity with the men's facilities. JCI maintained two sets of facilities for women employees: one for hourly employees and one for salaried or management personnel. Ford-Varnes' complaints are limited to the facilities for salaried female employees. Ford-Varnes admits to never having seen the conditions of the men's facilities and has no other evidence to support her contentions that they were maintained to a higher level than the women's facilities. Ford-Varnes further admits to having found the women's hourly facilities acceptable but chose not to use them. Finally, the salaried women's facilities were fixed and cleaned in 2002 and Ford-Varnes began using them daily. The record indicates that JCI did not deprive Ford-Varnes of facilities for required daily showering and ultimately remedied the situation with the salaried women's facilities.

14

The Court finds that the totality of incidents described by Plaintiff do not make out an "objectively hostile" environment—a work situation that is more than merely offensive, immature, or unprofessional, but is extreme. Kratzer v. Rockwell Collins, Inc., 398 F.3d 1040, 1047 (8th Cir. 2005). The described incidents are not so intimidating, offensive, or hostile that [they] poisoned the work environment." Gilooly v. Missouri Dept. of Health and Senior Services, 421 F.3d 734, 738 (8th Cir. 2005) (citations and internal quotations omitted). The conduct at issue must be more than "merely rude or unpleasant." Alagna, 324 F.3d at 979. Even when considered in conjunction, these incidents do not define a workplace that is "objectively hostile" in light of the present state of binding case law.

Finally, the Court is aware that discrimination statutes come into play before the harassing conduct seriously affects an employee's well-being. See Eich v. Board of Regents for Central Missouri State Univ., 850 F.3d 752, 758 (8th Cir. 2004). Even though Ford-Varnes suffers from significant health problems and has had to take medical leave on two occasions, she has failed to present sufficient evidence that this resulted *because of* actionable sexual harassment and not from the normal rigors of the workplace.

For these reasons, the Court finds that Plaintiff has not established her prima facie case and summary judgment in favor of the defendant on this claim is appropriate.

2.   Count II - Wage Discrimination

To recover under the Equal Pay Act, Ford-Varnes must prove that JCI discriminated on the basis of sex by paying different wages to employees of opposite sexes "for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C. § 206(d)(1). Wage discrimination claims under the MHRA

15

based on unequal pay for equal work are analyzed under Equal Pay Act standards. See Buettner v. Arch Coal Sales Co., Inc., 216 F.3d 707, 718-19 (8th Cir. 2000).

Under the Equal Pay Act, a plaintiff's prima facie case consists of sufficient evidence that the employer paid different salaries to men and women for equal work performed under similar conditions. The burden of establishing that the positions involve equal work rests on the plaintiff. Corning Glass Works v. Brennan, 417 U.S. 188, 195 (1974).

> Whether two jobs entail equal skill, equal effort, or equal responsibility requires practical judgment on the basis of all the facts and circumstances of a particular case. Skill includes such considerations as experience, training, education, and ability. Effort refers to physical or mental exertion necessary to the performance of a job. Responsibility concerns the degree of accountability required in performing a job.

E.E.O.C. v. Universal Underwriters Ins. Co., 653 F.2d 1243, 1245 (8th Cir. 1981). "Application of the equal pay standard is not dependent on job classifications or titles but depends rather on actual job requirements and performance." 29 C.F.R. § 1620.13(e). The mere fact that jobs are performed in different departments or locations within the establishment is not necessarily sufficient to demonstrate that unequal work is involved. See 29 C.F.R. § 1620.14(c). Similarly, the equal work standard does not require that compared jobs be identical, only that they be substantially equal. 29 CFR § 1620.13(a). Jobs with "insubstantial or minor differences in the degree or amount of skill, or effort, or responsibility required" will not preclude a finding of equivalence under the Equal Pay Act. 29 C.F.R. § 1620.14(a).

As detailed above in Section I.B., the engineers working at the St. Joseph plant do not all have the same level of education and experience. The record provides ample support for the conclusion that JCI assigns job duties and responsibilities to a particular employees based on his or her education and prior work experience. The record clearly establishes that Ford-Varnes did not

16

share the engineering education or experience of the engineers who received higher compensation than her. Further, two of the engineers identified by Plaintiff, Mr. Edington and Mr. Turner, worked in a different department involving different machinery and production responsibilities. The remaining engineers, while assigned to the casting department, worked on projects requiring more hours and more complex engineering skills—skills commensurate with their education and work experience.

In order to overcome the obvious differences in education, experience and duties, Ford-Varnes cites the deposition response given by Mr. Chamness when questioned why the different engineers were paid differently. He responded: "I don't know what that would be . . . other than they personally negotiated their salaries with the company." Ford-Varnes contends that because Mr. Chamness did not reference the difference in education, experience and duties as explanation for the difference in salaries between the various engineers, this suggests a wrongful motive for the wage disparity. This statement is insufficient to support such an allegation and there is no other evidence in the record indicating the engineering salary differentials are the result of sex.

Ford-Varnes also contends that the overtime system in place at the St. Joseph plant discriminates on the basis of sex. Ford-Varnes claims that she was unable to earn overtime like male engineers such as Mr. Turner, Mr. Edington, and Mr. McDonald. Although these individuals were permitted to earn overtime, they were the only engineers permitted to do so—male or female—at the plant from 2002 to 2004. Pursuant to company policy,[6] only engineers who were hired at the St. Joseph plant prior to 2000 were permitted to earn overtime. The record is clear that not a single

---

[6] Ford-Varnes argues that a genuine issue exists because neither the overtime policy nor the employment contracts were written. The Court agrees, in so far, that under certain circumstances this fact could create a genuine issue. However, here, the uncontradicted affidavit of the human resources manager supports the existence and terms of the overtime policy and the employment contracts.

Case 5:04-cv-06099-DW   Document 58   Filed 02/06/06   Page 17 of 22

engineer—male or female—hired after 2000 was permitted to earn overtime. The overtime system was based on seniority at the St. Joseph plant—a permissible basis to differentiate worker compensation. <u>Cf.</u> 29 C.F.R. § 1620.13(c) ("When factors such as seniority, education, or experience are used to determine the rate of pay, then those standards must be applied on a sex neutral basis.")

There is no genuine issue of fact here. Ford-Varnes has failed to present sufficient evidence supporting her claim that she performed equal work for less pay than male engineers at JCI's St. Jospeph plant. Furthermore, the record does not support an inference that either employee compensation or eligibility for overtime pay were determined in light of the sex of the employee. As a result, the allegations are insufficient to survive summary judgment. <u>See</u> <u>Horn</u>, 362 F.3d at 1045; <u>Sowell</u>, 251 F.3d at 683-84.

      3.    <u>Count III - Disability Discrimination</u>

Under the MHRA, disability is defined as a physical or mental impairment which substantially limits one or more of a person's major life activities, which with or without reasonable accommodation does not interfere with the performance of the person's job. Mo. Rev. Stat. § 213.010(4) (2004). In order to establish a prima facie case of disability discrimination under the MHRA, the plaintiff must show (1) that she is a member of a protected class because she has a disability protected by the statute, (2) that the employer took an adverse employment action against the employee, and (3) there is evidence to infer that the disability was a factor in the adverse employment action. <u>Cook v. Atoma Int'l of Am., Inc.,</u> 930 S.W.2d 43, 46 (Mo. Ct. App. 1996).

JCI argues that Plaintiff has failed to establish she is disabled under the MHRA. JCI concedes that Plaintiff suffers from clinical depression, but contends that she has not presented

18

evidence that her impairment substantially limits one of her major life activities. Ford-Varnes' bare statement that her depression affected her ability to concentrate and required her to take a leave of absence in March 2004 is insufficient to establish a substantial limitation of one of her major life activities. See Cody v. CIGNA Healthcare of St. Louis, Inc., 139 F.3d 595, 598 (8th Cir. 1998) (depression that causes life difficulties is not necessarily a substantial impairment amounting to a disability under the ADA or MHRA). Furthermore, after her leave of absence, Plaintiff's physician released and encouraged her to return to work. Finally, after resigning her employment with JCI, Plaintiff started her own business.

The Court also finds that Plaintiff has failed to establish an adverse employment action. "An adverse employment action is a tangible change in working conditions that produces a material employment disadvantage. Termination, reduction in pay or benefits, and changes in employment that significantly affect an employee's career prospects meet this standard." Cooney v. Union Pac. R.R. Co., 258 F.3d 731, 734 (8th Cir. 2001) (citations and internal quotations omitted). Not all employment actions or changes in conditions of employment are adverse. Changes in terms, duties, or working conditions that cause no materially significant disadvantage to the employee, even if disappointing to the employee, are not adverse. See Sowell v. Alumina Ceramics, Inc. 251 F.3d 678, 684 (8th Cir. 2001).

None of Plaintiff's allegedly adverse employment actions meet this standard. Plaintiff's requirement to discontinue working from home is not adverse in light of her changed responsibilities. The record demonstrates that Plaintiff no longer traveled to JCI's various plants and was primarily assigned to perform engineering duties at the St. Joseph plant. All other engineers at the St. Joseph plant were required to report daily and Ford-Varnes herself admitted that she knew

19

of no other engineers at JCI that were permitted to work from home.

The record also establishes that over the course of her employment Ford-Varnes received positive performance reviews and commensurate increases in her salary. She was singled out for exceptional performance on at least one occasion. No adverse consequences resulted from any instance where aspects of Ford-Varnes' performance were criticized. No denial of a job benefit, a change in job title, demotion or denial of a promotion resulted from Mr. Chamness' review of Ford-Varnes in November 2002. Similarly, no adverse employment consequences resulted from the periods of medical leave she took as a result of her condition. Furthermore, there is no evidence that the issues raised in her November 2002 review bore any relation to her depression or period of medical leave resulting from her depression.

The infrequent shift changes that Plaintiff was required to make are not "adverse actions." One could anticipate that in a plant that runs multiple shifts and staffs a limited number of process engineers, occasional shift changes may be required of such an engineer. Additionally, there is no evidence in the record that Ford-Varnes was singled out for the worst shifts or was not afforded an opportunity to request and receive her favored shifts. Indeed, her work schedule was fairly consistent and "normal" during the relevant time period—only two changes over the course of three years.

Finally, there is no evidence the record to support characterizing Ford-Varnes' voluntary resignation as either a termination because of her disability or a constructive discharge. Her physician approved her return to work, but instead of returning to JCI, Ford-Varnes started her own jewelry and bead business. There is no evidence in the record that JCI did not wish Ford-Varnes to return or otherwise prevented her returning to work at the St. Joseph plant.

20

An employee is constructively discharged if an employer renders the employee's working conditions so intolerable that the employee is forced to quit. See Henderson v. Simmons Foods, Inc., 217 F.3d 612, 617 (8th Cir. 1996). An employee's dissatisfaction with work assignments does not establish constructive discharge. See Tidwell v. Meyer's Bakeries, Inc., 93 F.3d 490, 496 (8th Cir. 1996).

Plaintiff alleges that Mr. Chamness should have been nicer and more sensitive to her condition and that his negative treatment of her was because he wanted to make her depressed. (Ford-Varnes Dep. at 253:18 - 254:17.) However, Ford-Varnes has not produced any evidence to support this otherwise conclusory allegation. For the same reasons that the Court concludes that Ford-Varnes' work environment was not objectively hostile, it follows that her work environment was not so intolerable as to compel a reasonable person to resign. See Pedroza v. Cintas Corp. No. 2, 397 F.3d 1063, 1071 (8th Cir. 2005); Alagna, 324 F.3d at 981; Duncan, 300 F.3d at 935-36.

There are no disputed material issues on Plaintiff's claim of disability discrimination under the MHRA; summary judgment in favor of JCI is appropriate.

III.   CONCLUSION

For the foregoing reasons, the Court hereby

DENIES Defendant's request to dismiss Plaintiff's claims under Fed. R. Civ. P. 41(b);

ORDERS that upon receipt of this Order, Plaintiff make payment of the sum of $1,272.72 due and owing to Defendant pursuant to the Court's June 28, 2005 Order, unless payment already has been made;

GRANTS summary judgment in favor of Defendant JCI on Plaintiff's claims of discrimination based upon a hostile work environment (Count I), wage discrimination (Count II),

21

and disability discrimination (Count III);

ORDERS that Plaintiff's claim of sex discrimination based on a theory of disparate treatment is dismissed *with prejudice*; and

ORDERS Plaintiff's claim of age discrimination under the Missouri Human Rights Act is dismissed *with prejudice*.

IT IS SO ORDERED.

                                    _____/s/ Dean Whipple_____
                                    Dean Whipple
                                    United States District Court


Date: February 6, 2006